IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA

v.

GREGG LOUIS GAMBLE,

      Defendant.

Case No. 3:24-cr-166

STATEMENT OF FACTS

      The United States and the defendant, GREGG LOUIS GAMBLE (hereinafter,
"GAMBLE"), agree that at trial, the United States would have proven the following facts beyond
a reasonable doubt with admissible and credible evidence:

      1.     From at least in or about summer 2023, the exact date being unknown, and
continuously thereafter up until September 13, 2024, in the Eastern District of Virginia, the
defendant, GREGG LOUIS GAMBLE, along with unindicted co-conspirators, did knowingly and
intentionally combine, conspire, confederate, and agree with other persons, to commit the
following offenses against the United States: to knowingly and intentionally distribute and possess
with the intent to distribute 5 kilograms or more of a mixture and substance containing a detectable
amount of cocaine hydrochloride, a Schedule II controlled substance, in violation of Title 21,
United States Code, Sections 841(a)(1) and 841(b)(1)(A), all in violation of Title 21, United States
Code, Section 846.

      2.     On or about September 13, 2024, in the Eastern District of Virginia, the defendant,
GREGG LOUIS GAMBLE, did knowingly and intentionally possess with the intent to distribute
500 grams or more of a mixture and substance containing a detectable amount of cocaine

hydrochloride, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B).

3.      On or about September 13, 2024, in the Eastern District of Virginia, the defendant, GREGG LOUIS GAMBLE, knowing that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly possess firearms, to wit: (1) a Smith & Wesson, Model M&P 40, .40 caliber semi-automatic pistol, bearing serial number HRL4961; and (2) a Bushmaster, Model XM15 E2S, .223 caliber rifle, bearing serial number L188757; in and affecting interstate and foreign commerce, in violation of Title 18, United States Code, Section 922(g)(1).

4.      From at least in or about summer 2023, GAMBLE entered into a conspiracy with other conspirators with the primary purpose of distributing cocaine to make money. As part of this conspiracy, GAMBLE negotiated and brokered the purchase of kilogram quantities of cocaine from Co-Conspirator #1. Upon agreeing to the purchase of this cocaine, GAMBLE coordinated and facilitated the arrival of these cocaine shipments by picking up and transporting cocaine from the Western District of North Carolina to the Eastern District of Virginia, as well as receiving the cocaine delivered by Co-Conspirator #1 to the Eastern District of Virginia. Once in possession of the cocaine, GAMBLE distributed the cocaine, stored the cocaine for further distribution, or transferred the cocaine to other co-conspirators in the Eastern District of Virginia, including Co-Conspirator #2, Co-Conspirator #3, Co-Conspirator #4, Co-Conspirator #5, Co-Conspirator #6, and Co-Conspirator #7. As part of this conspiracy, and as a direct result of his own conduct or conduct of other co-conspirators reasonably foreseeable to him, GAMBLE was responsible for the distribution and possession with the intent to distribute between at least 15 but less than 50 kilograms of cocaine.

5.    In furtherance of the conspiracy, GAMBLE frequently communicated via telephone and in person with Co-Conspirator #1, Co-Conspirator #2, Co-Conspirator #3, Co-Conspirator #4, Co-Conspirator #5, Co-Conspirator #6, and Co-Conspirator #7, amongst others. In these conversations, text communications, or face-to-face meetings, GAMBLE negotiated the price per kilogram of cocaine he was to purchase, discussed the amount of cocaine he or other co-conspirators had received, discussed the timing of the arrival of cocaine loads from his source of supply, and discussed the payment of money owed for cocaine.

6.    In furtherance of the conspiracy, on various dates between approximately summer 2023 and September 9, 2024, GAMBLE negotiated the purchase of, and arranged for the pickup or delivery of, kilogram quantities of cocaine from Co-Conspirator #1. In summer 2023, GAMBLE began purchasing one-kilogram loads of cocaine from Co-Conspirator #1. GAMBLE gradually increased the quantity he would purchase at one time from Co-Conspirator #1. By summer 2024, GAMBLE was acquiring ten kilograms of cocaine from Co-Conspirator #1 approximately a month apart, as well as additional cocaine approximately twice between monthly acquisitions. GAMBLE's last purchase of cocaine from Co-Conspirator #1 occurred on September 9, 2024. Prior to September 9, 2024, GAMBLE contacted Co-Conspirator #1 to discuss the logistics of receiving a shipment of cocaine from Co-Conspirator #1. On September 9, 2024, Co-Conspirator #1 traveled to Richmond, Virginia, to deliver the load of cocaine to GAMBLE. GAMBLE paid Co-Conspirator #1 $80,000 towards the balance GAMBLE owed for prior shipments of cocaine and received ten kilograms of cocaine from Co-Conspirator #1.

7.    In furtherance of the conspiracy, on various dates between approximately summer 2023 and September 13, 2024, GAMBLE distributed quantities of cocaine to Co-Conspirator #2. In summer 2023, GAMBLE began selling Co-Conspirator #2 ounce-quantities of cocaine. As

3

GAMBLE began receiving larger shipments from Co-Conspirator #1, he began selling larger quantities to Co-Conspirator #2. Starting in approximately summer 2024, GAMBLE began selling kilogram-quantities of cocaine to Co-Conspirator #2. When GAMBLE sold Co-Conspirator #2 a kilogram of cocaine, he often "fronted" Co-Conspirator #2 a kilogram of cocaine as well, meaning that GAMBLE provided Co-Conspirator #2 with two kilograms of cocaine, but Co-Conspirator #2 paid GAMBLE for only one kilogram of cocaine and would owe GAMBLE for the second. One example of a time GAMBLE sold cocaine to Co-Conspirator #2 was on August 29, 2024. Co-Conspirator #2 asked GAMBLE for one kilogram of cocaine, and GAMBLE drove to Co-Conspirator #2's house in Glen Allen, Virginia, and distributed the one kilogram of cocaine to Co-Conspirator #2.

8.      In furtherance of the conspiracy, on various dates between approximately summer 2023 and September 13, 2024, GAMBLE distributed quantities of cocaine to Co-Conspirator #3. In summer 2023, GAMBLE began selling Co-Conspirator #3 "eight balls" of cocaine, which is 1/8 of an ounce, or approximately 3.5 grams. As GAMBLE began receiving larger shipments from Co-Conspirator #1, he began selling larger quantities to Co-Conspirator #3. Starting in approximately summer 2024, GAMBLE began selling nine-ounce quantities of cocaine to Co-Conspirator #3. One example of a time GAMBLE sold cocaine to Co-Conspirator #3 was on August 25, 2024, when GAMBLE sold Co-Conspirator #3 nine ounces of cocaine for $4,600. GAMBLE and Co-Conspirator #3 met outside of a Golden Corral restaurant in Glen Allen, Virginia, where GAMBLE distributed the nine ounces of cocaine to Co-Conspirator #3.

9.      In furtherance of the conspiracy, on various dates between approximately summer 2023 and September 13, 2024, GAMBLE distributed quantities of cocaine to Co-Conspirator #4. In summer 2023, GAMBLE began selling Co-Conspirator #4 one-ounce quantities of cocaine. As

GAMBLE began receiving larger shipments from Co-Conspirator #1, he began selling larger quantities to Co-Conspirator #4. By summer 2024, Co-Conspirator #4 would often purchase his usual ounce-quantities of cocaine to sell to his customers and sometimes "middle" larger deals. "Middling" a deal means that Co-Conspirator #4 had a customer who wanted to purchase a larger quantity, so Co-Conspirator #4 would buy that quantity from GAMBLE in order to immediately re-sell it to one customer. One example of a time GAMBLE sold cocaine to Co-Conspirator #4 was on August 6, 2024. Co-Conspirator #4 purchased one kilogram of cocaine to immediately resell to one of his customers, as well as an additional four ounces of cocaine. Co-Conspirator #4 paid GAMBLE a total of $22,000, which included payment for the kilogram he was "middling," payment for the four ounces, and money he owed GAMBLE from prior cocaine deals.

10.     In furtherance of the conspiracy, on various dates between approximately summer 2024 and September 13, 2024, GAMBLE distributed quantities of cocaine to Co-Conspirator #5. Co-Conspirator #5 typically purchased nine-ounce quantities of cocaine from GAMBLE. One example of a time GAMBLE sold cocaine to Co-Conspirator #5 was on September 7, 2024, when GAMBLE sold Co-Conspirator #5 394 grams (approximately 14 ounces) for $7,200. GAMBLE met Co-Conspirator #5 in a parking lot in Richmond, Virginia to distribute the 394 grams of cocaine to Co-Conspirator #5.

11.     In furtherance of the conspiracy, on various dates between approximately summer 2024 and September 13, 2024, GAMBLE distributed quantities of cocaine to Co-Conspirator #6. In summer 2024, GAMBLE began selling Co-Conspirator #6 one-half-kilogram quantities of cocaine. Later in summer 2024, GAMBLE sold Co-Conspirator #6 one-kilogram quantities of cocaine. GAMBLE also sometimes "fronted" Co-Conspirator #6 an additional one-half kilogram, to be paid for later. One example of a time GAMBLE sold cocaine to Co-Conspirator #6 was on

5

July 31, 2024, when GAMBLE sold Co-Conspirator #6 one-half kilogram of cocaine. GAMBLE met Co-Conspirator #6 in the parking lot of a Food Lion in Richmond, Virginia, to distribute the one-half kilogram of cocaine to Co-Conspirator #6.

12.     In furtherance of the conspiracy, on various dates between approximately summer 2023 and September 13, 2024, GAMBLE distributed quantities of cocaine to Co-Conspirator #7. GAMBLE sold cocaine to Co-Conspirator #7 a total of approximately four times. Co-Conspirator #7 typically purchased nine-ounce quantities of cocaine from GAMBLE, but on September 10, 2024, Co-Conspirator #7 purchased one-half kilogram of cocaine from GAMBLE for $9,000. GAMBLE met Co-Conspirator #7 in a parking lot in Richmond, Virginia to distribute the one-half kilogram of cocaine to Co-Conspirator #7.

13.     On September 13, 2024, Homeland Security Investigations and Virginia State Police executed a federal search warrant at GAMBLE's residence in Glen Allen, Virginia. During the search, the investigative team located and seized the following:

    a. Three approximately one-kilogram bricks of suspected cocaine, from a safe on the bottom floor of GAMBLE's house;

    b. Two Ziploc bags of suspected cocaine weighing a total of approximately 500 grams, from a safe in GAMBLE's closet;

    c. $126,020 from the safe in GAMBLE's closet, sitting beside the Ziploc bags of cocaine;

    d. $35,000 from the nightstand in GAMBLE's bedroom, next to where GAMBLE slept;

    e. A Bushmaster, Model XM15 E2S, .223 caliber rifle, bearing serial number L188757, from behind the headboard of the bed where GAMBLE slept;

f.  A Smith & Wesson, Model M&P 40, .40 caliber semi-automatic pistol, bearing serial number HRL4961, from GAMBLE's Chevrolet Tahoe; and

g.  A total of 547 rounds of ammunition, from various locations.

14.    The Smith & Wesson, Model M&P 40, .40 caliber semi-automatic pistol, bearing serial number HRL4961; and Bushmaster, Model XM15 E2S, .223 caliber rifle, bearing serial number L188757, were determined to be firearms within the meaning of Title 18, United States Code, Section 921(a)(3). GAMBLE knowingly possessed these firearms on September 13, 2024. Further, it was determined that these firearms were manufactured outside of the Commonwealth of Virginia and therefore traveled in interstate or foreign commerce prior to the defendant possessing them on September 13, 2024.

15.    Prior to September 13, 2024, GAMBLE knew he had been convicted of a crime punishable by a term of imprisonment exceeding one year and was in fact a convicted felon at all relevant times.

16.    The Virginia Department of Forensic Sciences tested the suspected cocaine recovered from GAMBLE's residence on September 13, 2024 and found it consisted of a total of 3,518 grams of powder containing cocaine. GAMBLE intended to distribute this cocaine seized from his home.

17.    For purposes of relevant conduct, the parties stipulate that GAMBLE distributed and conspired with others to distribute between at least 15 kilograms but less than 50 kilograms of cocaine, to include converted drug proceeds. At all relevant times, GAMBLE knew he was distributing or conspiring with others to distribute controlled substances. As a result, pursuant to Section 2D1.1(c) of the Sentencing Guidelines, relating to Drug Quantity, the parties agree the GAMBLE distributed, or it was reasonably foreseeable to GAMBLE that he distributed or

possessed with the intent to distribute at least 15 kilograms but less than 50 kilograms of cocaine (Level 32). In addition, pursuant to 2D1.1(b)(1) of the Sentencing Guidelines, the parties agree that GAMBLE possessed a dangerous weapon, i.e., a firearm in relation to this offense, resulting in a two-level enhancement. And the parties agree that pursuant to Section 2D1.1(b)(12) of the Sentencing Guidelines, GAMBLE maintained a premises for the purpose of distributing a controlled substance, resulting in a two-level enhancement. Further the parties stipulate and will recommend to the Court that no other specific offense characteristics apply and no other Chapter 3 adjustments apply.

18.     This statement of facts includes those facts necessary to support GAMBLE's plea of guilty. It does not include each and every fact known to GAMBLE or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding GAMBLE's case.

19.     The actions of GAMBLE, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.


Respectfully submitted,

Jessica D. Aber
United States Attorney

Date: 12/6/2024            By: _____
                                Jessica L. Wright
                                Assistant United States Attorney

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____     Date: 12/6/24
GREGG LOUIS GAMBLE

I am Lauren Whitley, defendant's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____     Date: 12/6/24
Lauren Whitley
Attorney for GREGG LOUIS GAMBLE

9